1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON (SBN 174882)
frankj@johnsonandweaver.com
SHAWN E. FIELDS (SBN 255267)
shawnf@johnsonandweaver.com
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOEL DUNCAN, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>VICAL INCORPORATED, VIJAY B. SAMANT, JILL M. BROADFOOT, and ANTHONY A. RAMOS,<br><br>                    Defendants. | Case No.:  **'13 CV 2628 DMS RBB**<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

CLASS ACTION COMPLAINT

By and through his undersigned counsel, Plaintiff Joel Duncan ("Plaintiff") brings this action individually and on behalf of a class of persons (the "Class") who purchased or otherwise acquired securities of Vical Incorporated ("Vical" or the "Company") between February 8, 2012 and August 12, 2013 (the "Class Period") and were damaged thereby. Plaintiff alleges claims against Vical and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), including materially false and misleading statements made by Vical and certain of its officers and/or directors to investors and the public regarding Vical's ability to obtain federal approval for one of its primary products, Allovectin-7® ("Allovectin"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: a) review and analysis of public filings made by Vical and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on Vical's website concerning the Company's public statements; and d) review of other publicly available information concerning Vical and certain of the defendants.

## I.    INTRODUCTION

1.    Vical is a biopharmaceutical company that researches and develops products based on patented DNA delivery technologies for the prevention and treatment of serious and life-threatening illnesses, including cancer.

2.    All of Vical's potential products are in the research and development ("R&D") phases, and no revenues have yet been generated from the

sale of any products.  The Company earns revenues from R&D agreements with pharmaceutical companies and from grants or contracts with government entities.

3.    Vical's strongest candidate to receive approval by the U.S. Food and Drug Administration ("FDA") for eventual sale and marketing to consumers was Allovectin, an immunotherapy vaccine that targets cancer.  More than half of the Company's research, development, manufacturing and production costs in recent years went toward the Allovectin program, and from inception through December 31, 2012, the Company spent approximately $166 million on the Allovectin program.

4.    Throughout the Class Period, Defendants violated the federal securities laws by repeatedly touting the importance and potential success of Allovectin.  Investors were led to believe that Allovectin would receive approval from the FDA through Defendants' dissemination of materially false and misleading statements regarding the Phase 3 trial design and results.

5.    However, as Defendants became aware of disappointing news, they failed to disclose this information to investors.

6.    Defendants consistently misled investors about Vical's current and future business and financial condition.  In particular, throughout the Class Period, Defendants made materially false and misleading statements concerning, *inter alia*, Allovectin's efficacy and likelihood of success in the Phase 3 trial, and the overall current and future business prospects for Allovectin and the Company.  As a result of Defendants' misleading statements, Vical's stock traded at artificially inflated prices during the Class Period.

7.    Finally, on August 12, 2013, Vical announced the results of the Phase 3 Allovectin trial, which showed that the vaccine failed to show an improvement over chemotherapy, and since "Allovectin simply did not provide the expected benefits," the Allovectin program would be terminated.

CLASS ACTION COMPLAINT

8.     As a result of the false and misleading statements disseminated by Defendants, Vical stock traded at artificially inflated levels during the Class Period, and Plaintiff and the other members of the Class lost money as a result of Defendants' wrongdoing.

## II.     JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

11.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and §27 of the 1934 Act (15 U.S.C. §78aa) because many of the acts and practices complained of herein occurred in substantial part in this District.   Vical is headquartered in this District and each of the other Defendants has extensive contacts with California as a director and/or officer of Vical or otherwise, which makes the exercise of personal jurisdiction over them proper.

## III.    THE PARTIES

12.    Plaintiff purchased the publicly traded securities of Vical during the Class Period, as set forth in the certification attached hereto, and was damaged as a result of Defendants' wrongdoing as alleged herein.

13.    Defendant Vical is incorporated in Delaware and trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "VICL."   The Company's headquarters are located at 10390 Pacific Center Court, San Diego, CA 92121.   Vical is a company that researches and develops biopharmaceutical products.

14.    Defendant Vijay B. Samant ("Samant") is and at all relevant times has been, President, Chief Executive Officer, and a director of the Company.

3

CLASS ACTION COMPLAINT

1  Samant joined Vical in November 2000.  Samant has also served as acting Chief
2  Financial Officer since April 12, 2013.

3      15.    Defendant Jill M. Broadfoot ("Broadfoot") served as Vical's Chief
4  Financial Officer and Secretary from October 2004 until her resignation on April
5  1, 2013.  Broadfoot also served as the Senior Vice President from January 2009
6  until April 1, 2013.

7      16.    Defendant Anthony A. Ramos ("Ramos") has served as Chief
8  Accounting Officer since July 2010, and has served as the Company's principal
9  accounting officer since April 2013.  Ramos previously served as the Company's
10  Corporate Controller from February 2005 until July 2010.

11      17.    Defendants Samant, Broadfoot, and Ramos are referred to herein as
12  the "Individual Defendants."

13  **IV.    FACTUAL ALLEGATIONS**

14      18.    Vical was incorporated in 1987 to research and develop proprietary
15  lipid chemistry.  The Company's founders were initially focused on developing
16  liposomes for extended release of AZT, a treatment for patients with AIDS.  In
17  1989, experiments and evaluations of lipid-based delivery of DNA led to Vical's
18  DNA delivery patents, which form the basis of the Company's current products.

19      19.    Vical completed its initial public offering of 2 million shares of stock
20  in 1993, and since its inception, the Company has raised total net proceeds of
21  approximately $370 million from the sale of equity securities.

22      20.    The first United States patent on Vical's core DNA delivery
23  technology, which formed the cornerstone of the Company's comprehensive
24  patent portfolio, was issued in December 1996.  All of Vical's potential products
25  are in the R&D phases, and no revenues have yet been generated from the sale of
26  any products.    The Company earns revenues from R&D agreements with
27  pharmaceutical companies and from grants or contracts with government entities.

28

4

21.     FDA approval is required prior to marketing a pharmaceutical product in the United States.  To obtain this approval, the FDA requires clinical trials to demonstrate the safety, efficacy, and potency of the product candidates. New therapies typically advance from laboratory testing through animal testing, and finally through several phases of clinical (human) testing.  Upon successful completion of clinical trials, approval to market the therapy for a particular patient population may be requested from the FDA in the United States and/or its counterparts in other countries.

22.     Clinical trials are normally done in three phases.  In Phase 1, trials are conducted with a small number of patients or healthy volunteers to determine the safety profile, the pattern of drug distribution and metabolism, and early evidence of effectiveness.  In Phase 2, trials are conducted with a larger group of patients afflicted with a target disease in order to determine preliminary efficacy, optimal dosages and expanded evidence of safety.  In Phase 3, large scale, multi-center, comparative trials are conducted with patients affected with a target disease in order to provide enough data for the statistical proof of safety, efficacy, and potency required by the FDA and other regulatory authorities.  For life-threatening diseases, initial human testing generally is done in patients rather than healthy volunteers.

23.     Vical developed its first cancer immunotherapy product candidate, Allovectin, for treatment of various solid tumors.

24.     Allovectin entered Phase 1 clinical trials in 1994.  In 1999, Allovectin was granted orphan drug designation for the treatment of invasive and metastatic melanoma by the FDA's Office of Orphan Products Development. Orphan drug designation provides United States marketing exclusivity for seven years if approval is received from the FDA, in addition to certain tax benefits for qualifying expenses.

CLASS ACTION COMPLAINT

1       25.    In 2001, Vical began a high-dose, 2 mg, Phase 2 trial evaluating

2   Allovectin for patients with stage III or stage IV melanoma, who have few other

3   treatment options.  The high-dose Phase 2 trial completed enrollment in 2003.

4       26.    Based on detailed guidance received from the FDA after the end of

5   the Phase 2 trial, the Company completed a Special Protocol Assessment

6   ("SPA") with the FDA for a Phase 3 trial of high-dose, 2 mg, Allovectin for

7   certain patients with stage III or stage IV melanoma.  The SPA specified the trial

8   objectives and design, clinical endpoints and planned analyses expected to be

9   needed for product approval.

10      27.    In 2006, Vical entered into an agreement with AnGes MG, Inc.

11  ("AnGes") for a $22.6 million commitment toward the development of

12  Allovectin, and initiated an AnGes-funded Phase 3 trial in metastatic melanoma.

13      28.    In January 2007, Vical and AnGes announced the start of the Phase

14  3 clinical trial for Allovectin.

15      29.    In February 2010, Defendant Samant stated during the Company's

16  quarterly earnings call to investors that: "We are excited by how this trial has

17  progressed, and we want to make sure we allow enough time for the data to

18  mature.  Based on this information today, we would expect to lock the clinical

19  trial database around mid-2011."  During 2010, Defendant Samant continued to

20  repeat a target date of mid-2011 for the end of Allovectin's Phase 3 trial data in

21  the Company's earnings calls.  On the August 2011 quarterly earnings call,

22  Defendant Samant told investors that the target date for the release of data was

23  delayed until the second quarter of 2012.

24      30.    On February 8, 2012, the start of the Class Period, Defendants

25  issued a press release and filed Form 8-K with the SEC announcing financial

26  results for the last quarter and full year ended December 31, 2011.  The press

27  release also revealed that:

28

6

CLASS ACTION COMPLAINT

In the company's Phase 3 registration trial of Allovectin® in patients with metastatic melanoma, enrollment was completed in February 2010.  With a maximum two-year treatment period, the last patients will receive their final treatments in February 2012.  Based on the latest available information on overall number of deaths, the company expects to reach the target number of death events for the secondary endpoint (overall survival) in late 2012. Data collection and independent adjudication for the primary endpoint (response rate at 24 weeks or more after randomization) will be conducted in parallel, and ***top-line data for both endpoints is expected to be released in late 2012***.

31.    On March 15, 2012, Defendants filed the Company's annual report for 2011 on Form 10-K with the SEC, which was signed and certified by Defendants Samant and Broadfoot.   The Form 10-K included the following statements:

Allovectin ® is a plasmid/lipid formulation containing the DNA sequences encoding HLA-B7 and ß2 microglobulin, which together form a MHC Class I complex.  We believe injection of Allovectin ® directly into tumor lesions directs a local, regional and systemic immune response against metastatic tumors through several mechanisms. In HLA-B7 negative patients, a vigorous allogeneic immune response may be initiated against the foreign MHC class I antigen. In all patients, ß2 microglobulin may reconstitute normal class I antigen presentation and/or increase tumor antigen presentation to the immune system. In any patient, an innate pro-inflammatory response may occur that induces tumor responses following intralesional injection of the pDNA/lipid complex. The goal of all three of these mechanisms is to initially cause recognition of the tumor at the local site to allow a then-sensitized immune response to recognize un-injected tumors at distant metastatic sites.

In 2001, we began a high-dose, 2 mg, Phase 2 trial evaluating the Allovectin® immunotherapeutic alone for patients with stage III or stage IV melanoma, who have few other treatment options. The

7

CLASS ACTION COMPLAINT

high-dose Phase 2 trial completed enrollment in 2003. The data showed that the trial had a total of 15 responders among the 127 patients receiving the high dose (11.8 %), with four of the patients having complete responses and 11 having partial responses. Data were recently updated after long-term follow-up. The Kaplan-Meier estimated median duration of response was 13.8 months, and all responses were durable with a range of 6 months to 77 months. The updated Kaplan-Meier median survival was 18.8 months. The safety profile was excellent with no reported Grade 3 or Grade 4 adverse events associated with Allovectin®.

Based on detailed guidance received from the U.S. Food and Drug Administration, or FDA, in an End-of-Phase 2 meeting, we subsequently completed a Special Protocol Assessment, or SPA, with the FDA for a Phase 3 trial of high-dose, 2 mg, Allovectin® for certain patients with recurrent Stage III or Stage IV melanoma. The SPA-agreed protocol specifies the trial objectives and design, clinical endpoints, and planned analyses expected to yield data that will support a license application for product approval.

Enrollment in the Phase 3 trial began in December 2006 and has involved more than 100 clinical sites. Patients could have been previously treated with surgery, adjuvant therapy, and/or biotherapy, but could not have been previously treated with chemotherapy. The patients were randomized on a 2:1 basis with 260 patients treated with Allovectin® and 130 treated with their physician's choice of either of two chemotherapy agents, dacarbazine or temozolomide. The primary endpoint is overall response rate that compares the two trial arms for objective responses that are ongoing or commence at 24 weeks or more after randomization. The study will also evaluate safety and tolerability as well as survival as secondary endpoints. ***The trial is currently in the final stages of patient follow-up, data collection and analysis, which is expected to be completed in late 2012***.

32.     Once the last patients received their final treatments in February 2012, there was no reason for Defendants to delay the release of results regarding

8

the study data.  But rather than revealing the study results, Defendants misled Vical's shareholders by moving the goal posts and pushing back the target dates.

33.    On May 2, 2012, Defendants issued a press release and filed Form 8-K with the SEC announcing financial results for the first quarter of 2012 ended March 31, 2012.  The press release included the following statements:

> In the company's Phase 3 registration trial of Allovectin® in patients with metastatic melanoma, enrollment was completed in February 2010. With a maximum two-year treatment period, the last patients received their final treatments in February 2012.  The final post-treatment safety follow-up visits for these patients were completed by the end of March.
>
> . . .
>
> In the company's Phase 3 registration trial of Allovectin® in patients with metastatic melanoma, the company expects to reach the target number of death events for the secondary endpoint (overall survival) in late 2012.  Data collection and independent adjudication for the primary endpoint (response rate at 24 weeks or more after randomization) will be conducted in parallel, and ***top-line data for both endpoints is expected to be released in late 2012***.

34.    On the same date, Defendants filed Form 10-Q with the SEC reporting the Company's results for the first quarter of 2012 ended March 31, 2012, signed by Defendant Broadfoot and certified by Defendants Samant and Broadfoot.  The Form 10-Q did not contain any additional statements regarding Allovectin's Phase 3 trial results.

35.    On May 31, 2012, Defendants filed Form 8-K with the SEC announcing that on May 24, 2012, Vical's Amended and Restated Stock Incentive Plan was amended to increase the aggregate number of shares of common stock reserved for issuance under the plan by 3,000,000 shares.

9

CLASS ACTION COMPLAINT

36.   On August 1, 2012, Defendants issued a press release and filed Form 8-K with the SEC announcing financial results for the second quarter of 2012 ended June 30, 2012.  The press release included the following statements:

> In the company's Phase 3 registration trial of Allovectin® in patients with metastatic melanoma, data collection for the primary endpoint (response rate at 24 weeks or more after randomization) is completed and independent adjudication is ongoing. ***The company expects to reach the target number of death events for the secondary endpoint (overall survival) in late 2012, and to release top-line data for both endpoints as soon as practical after that***.

37.   On August 8, 2012, Defendants filed Form 10-Q with the SEC reporting the Company's results for the second quarter of 2012 ended June 30, 2012, signed by Defendant Broadfoot and certified by Defendants Samant and Broadfoot.  The Form 10-Q did not contain any additional statements regarding Allovectin's Phase 3 trial results.

38.   On November 7, 2012, Defendants issued a press release and filed Form 8-K with the SEC announcing financial results for the third quarter of 2012 ended September 30, 2012.  The press release included the following statements:

> In September 2012, the company conducted a comprehensive sweep of all active clinical sites in its Phase 3 Allovectin® melanoma trial to eliminate any time lag in death event reporting. The sweep confirmed that the target number of events has not been reached. It also confirmed the steady progress towards that goal. Based on the moving average monthly event rate, the company has revised its projection for reaching the target number of death events to mid-2013. With immunotherapy like Allovectin®, the treatment impact may occur much later than with chemotherapy, in which case the greatest separation between the two survival curves could occur at later time points. Waiting to achieve the target number of death

10

events will provide improved statistical power for the evaluation of the survival endpoint.

The company also is extending the schedule for independent adjudication of data for the primary endpoint (response rate at 24 weeks or more after randomization) to allow as thorough a review as possible. The databases for both endpoints will remain blinded until the target number of death events is reached and results for both endpoints will be released simultaneously.

39.    On February 15, 2013, Defendants filed the Company's annual report for 2012 on Form 10-K with the SEC, which was signed and certified by Defendants Samant and Broadfoot.   The Form 10-K included the following statements:

Enrollment in the Phase 3 trial began in December 2006 and has involved more than 100 clinical sites. Patients could have been previously treated with surgery, adjuvant therapy, and/or biotherapy, but could not have been previously treated with chemotherapy. The patients were randomized on a 2:1 basis with 260 patients treated with Allovectin® and 130 treated with their physician's choice of either of two chemotherapy agents, dacarbazine or temozolomide. The primary endpoint is overall response rate that compares the two trial arms for objective responses that are ongoing or commence at 24 weeks or more after randomization. The study will also evaluate safety and tolerability as well as survival as secondary endpoints. ***The trial is currently in the final stages of patient follow-up, data collection and analysis, which is expected to be completed in 2013***.

40.    On May 9, 2013, Defendants issued a press release and filed Form 8-K with the SEC announcing financial results for the first quarter of 2013 ended March 31, 2013.  The press release included the following statements:

1
2
3

> The company is approaching completion of a Phase 3 registration trial of its investigational immunotherapy, Allovectin®, vs. chemotherapy in patients with metastatic melanoma.

4
5
6

> A survival data sweep conducted in March 2013 confirmed that the target number of death events for the secondary endpoint (overall survival) should be reached in mid-2013.

7
8
9
10

> The independent assessment and adjudication process for the primary endpoint (response rate at 24 weeks or more after randomization) is advancing through final audits and quality checks, and the company expects the adjudicated response data to be locked in July 2013.

11
12
13
14

> Data for both endpoints will remain blinded in separate third-party databases and be securely transferred to Vical and unblinded simultaneously. Top-line results for both endpoints are expected to be released during the third quarter of 2013.

15
16
17
18
19

41.    On May 10, 2013, Defendants filed Form 10-Q with the SEC reporting the Company's results for the first quarter of 2013 ended March 31, 2013, signed by Defendant Broadfoot and certified by Defendants Samant and Broadfoot.  The Form 10-Q did not contain any additional statements regarding Allovectin's Phase 3 trial results.

20
21
22
23
24
25

42.    As recently as August 1, 2013, when the Company announced results for the second quarter of 2013, Defendants continued to misleadingly claim that the Company anticipated success through Allovectin.  On that date, Defendants issued a press release and filed Form 8-K with the SEC announcing financial results for the second quarter of 2013 ended June 30, 2013.   The Form 8-K stated in part:

26
27
28

> Top-line results from the company's Phase 3 registration trial of Allovectin®, previously projected for release in the third quarter of 2013, are now expected to be released in August.

12

Following today's scheduled conference call, as described below, and extending until the release of top-line results, the company will enter a self-imposed quiet period during which time company management will not be interacting substantively with the investment community.

43.    On August 12, 2013, the Individual Defendants caused Vical to issue a press release announcing that Allovectin had failed to demonstrate effectiveness in the Phase 3 trial, and that the Company was terminating the Allovectin program.  The release provided in part:

SAN DIEGO, Aug. 12, 2013 (GLOBE NEWSWIRE) -- Vical Incorporated (VICL) today announced top-line results from a Phase 3 trial of Allovectin® (velimogene aliplasmid), an investigational intratumoral cancer immunotherapy, in patients with metastatic melanoma. The 390-subject trial failed to demonstrate a statistically significant improvement vs. first-line chemotherapy for either the primary endpoint of objective response rate at 24 weeks or more after randomization or the secondary endpoint of overall survival. Trial data will be further analyzed and detailed results will be submitted for publication.

"We are disappointed that the trial did not meet either the primary or secondary efficacy endpoints, even though we believe it was well-designed and well-executed," said Vijay B. Samant, President and Chief Executive Officer of Vical. "Based on this outcome, we are terminating the Allovectin® program and focusing our resources on our infectious disease vaccine programs."

44.    In a conference call with investors later the same day, Defendant Samant continued to defend the false and misleading statements about Allovectin made by Defendants, claiming that:

We truly believed in the potential of this program based on our promising Phase 2 and earlier results, we were preparing for successful advancement through the regulatory approval process

13

and towards the commercial launch. And so we are very deeply disappointed with the results announced this morning that our Phase 3 trial of Allovectin failed to beat either the primary or secondary efficacy endpoints. We believe our trial was well designed to demonstrate a response rate and survival benefit for Allovectin compared with chemotherapy. We believe the results are clear and conclusive, with no margin for alternative interpretation. Allovectin simply did not provide the expected benefits, we do not see a feasible path forward for Allovectin, and we are therefore terminating the program.

45.     The foregoing statements by Defendants concerning, *inter alia*, the Company's current business and financial condition, future prospects for approval of Allovectin, and the Company's future success, were each materially false and misleading when made. These statements were materially false and misleading when made because the Defendants failed to disclose the following true facts which were known to Defendants or recklessly disregarded:

(a)     The announcement of Allovectin's Phase 3 trial results was deliberately delayed to avoid revealing the truth to the market; and

(b)     Based upon the above, Defendants lacked a reasonable basis for their positive statements about the Company and its outlook, including statements about its ability to launch Allovectin.

46.     Rather than disclose these critical facts to investors, Defendants kept silent throughout the Class Period while the Company's stock traded at artificially inflated prices. Yet after Defendants were forced to reveal the truth, the Company's shares were hammered by massive sales.

## V.     ADDITIONAL ALLEGATIONS REGARDING SCIENTER

47.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated to the investing public in the name of the Company were materially false and misleading, and

14

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

48.     As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme by virtue of their receipt of information reflecting the true facts regarding Vical, their control over, and/or receipt and/or modification of Vical's materially misleading misstatements, and/or their associations with the Company, which made each of them privy to confidential proprietary information concerning Vical.

## VI.   LOSS CAUSATION

49.     During the Class Period, as detailed herein, Defendants made or caused to be made, a series of materially false or misleading statements about Vical's current and future financial condition and business prospects.  These material misstatements and omissions created an unrealistically positive assessment of Vical in the market, and caused Vical's publicly traded securities to be overvalued and artificially inflated during the Class Period.

50.     Defendants engaged in this scheme to deceive the market through a course of conduct that operated as a fraud or deceit on Class Period purchasers by widely disseminating the false and misleading statements to securities markets, investment analysts, and the investing public, which caused Plaintiff and the other members of the Class to purchase Vical's stock at artificially inflated prices.

51.     When the truth concerning Vical's business prospects was revealed and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Vical stock fell substantially, resulting in significant damages to Plaintiff and the other members of the Class.

52.   If the truth about Vical had been revealed earlier, Plaintiff and the other members of the Class would not have purchased Vical stock, or would have purchased the publicly traded securities only at lower prices.

53.   Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the other members of the Class.

## VII.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

54.   At all relevant times, the market for Vical's common stock was an efficient market for reasons including, *inter alia*, the following:

a.   Vical's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ exchange, an automated and highly efficient market;

b.   As a public securities issuer regulated by the SEC, Vical filed periodic reports with the SEC and the NASDAQ;

c.   Vical regularly communicated with public investors through the regular dissemination of press releases, which were widely distributed through the media, and also communicated with the public through presentations and investor conference calls; and

d.   Vical was followed by financial securities analysts who wrote and distributed publicly available reports regarding Vical stock.

55.   As a result of the foregoing, the market promptly incorporated current information regarding Vical from all publicly available sources and reflected such information in the price of Vical common stock.  Under these circumstances, a presumption of reliance applies, as all purchasers of Vical securities during the Class Period suffered similar injury through their purchase of Vical securities on the market at artificially inflated prices.

## VIII.  NO SAFE HARBOR

56.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements set forth in this complaint.   Many of the specific statements pleaded herein were not identified as forward-looking statements when made.

57.    To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward looking statements.   Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the statement was false, and/or the statement was authorized and/or approved by an executive officer of Vical who knew that the statement was false when made.

## IX.    CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class, consisting of all who purchased or otherwise acquired Vical publicly traded securities during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

59.    The members of the Class are so numerous that joinder of all members is impracticable.   During the Class Period, Vical's securities were actively traded on the NASDAQ, and the Company had over 86 million shares of common stock issued and outstanding.   While the exact number of Class

17

members is unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vical or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60.   There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

a.   whether Defendants violated the 1934 Act;

b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, future prospects and management of Vical;

c.   whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   whether the price of Vical securities was artificially inflated; and

e.   the extent to which members of the Class have sustained damages and the proper measure of damages.

61.   Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

62.   Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.  Plaintiff does not have any interests adverse to the interests of the Class.

CLASS ACTION COMPLAINT

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

64.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

65.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Vical common stock during the Class Period.

CLASS ACTION COMPLAINT

67.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vical publicly traded securities.   Plaintiff and the Class would not have purchased Vical publicly traded securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

68.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.   The Individual Defendants acted as controlling persons of Vical within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of Vical stock, the Individual Defendants had the power and authority to cause Vical to engage in the wrongful conduct complained of herein.  Vical controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper class action, designating Plaintiff as lead plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiff's counsel as lead counsel;

B.   Awarding to Plaintiff and the members of the Class damages, including interest;

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such equitable/injunctive or other and further relief as the Court deems just and proper.

## XI.    JURY DEMAND

Plaintiff demands a trial by jury.


Dated: October 30, 2013

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
SHAWN E. FIELDS


By:  /s Frank J. Johnson
FRANK J. JOHNSON

110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com
shawnf@johnsonandweaver.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT

## <u>CERTIFICATION OF PLAINTIFF PURSUANT<br>TO THE FEDERAL SECURITIES LAWS</u>

I, Joel Duncan, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 2/10/12 | 500 | $3.3461 |
| 2/10/12 | 500 | $3.2961 |
| 2/10/12 | 125 | $3.3465 |
| 3/6/12 | 1000 | $3.0095 |
| 3/11/13 | 1000 | $4.2385 |
| 6/18/13 | 500 | $3.1400 |
| 6/19/13 | 2000 | $3.1562 |
| 7/30/13 | 600 | $3.8090 |
| 7/30/13 | 1000 | $3.8490 |
| 7/31/13 | 3000 | $3.8699 |

**Acquisitions:**

**Sales:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| Date Sold | Number of Shares Sold | Selling Price Per Share |
| 3/26/12 | 1125 | $3.1800 |
| 1/16/13 | 1000 | $3.5225 |
| 7/17/13 | 2000 | $3.8201 |
| 7/17/13 | 1500 | $3.7926 |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  29th  day of October, 2013.

Joel Duncan